## In the United States District Court
## for the District of Kansas

**United States of America**,
          *Plaintiff*,

v.                                        Case No. 12-CR-20139-001

**Robert Dobbertin,**
          *Defendant*.

## Motion to Reduce Sentence under 18 U.S.C. § 3582(c)(1)(A)(i)

Robert Dobbertin, through counsel, respectfully asks the Court to reduce his 120-month sentence (of which he has 13 months remaining until his projected BOP release date) to time served.[1]

The following reasons collectively constitute extraordinary and compelling reasons warranting immediate reduction of Mr. Dobbertin's sentence: (1) Mr. Dobbertin suffers from a combination of serious health ailments, including obesity, Type II diabetes, and hypertension, which place him in the highest-risk category for serious illness or death if (and when) he is infected by COVID-19; (2) he is imprisoned at FCI Milan, where, to date, there have been over 150 reported positive COVID-19 tests and three inmate deaths; and (3) he has served the majority of his 120-month sentence, completed numerous BOP programs, and has maintained clear conduct since being incarcerated. The government opposes this motion.

---

[1] 18 U.S.C. § 3582(c)(1)(A)(i).

## 1. Background

### 1.1    Mr. Dobbertin's underlying conviction.

In November 2012, the government filed a two-count indictment against Mr. Dobbertin in the District of Kansas, charging him with one count of enticement of a minor in violation of 18 U.S.C. § 2422(b), and possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B).[2] On April 15, 2013, Mr. Dobbertin pleaded guilty with a plea agreement to enticement of a minor.[3] On July 26, 2013, the district court sentenced Mr. Dobbertin to a mandatory minimum 120 months' imprisonment followed by a five-year term of supervised release.[4]

Since being taken into custody on this matter, Mr. Dobbertin has maintained clear conduct.[5] His current release date from BOP custody is August 7, 2021.[6] It is counsel's understanding that Mr. Dobbertin has been approved to release to a halfway house in February 2021.

### 1.2    Mr. Dobbertin's underlying health conditions place him at the highest risk of serious illness or death from COVID-19.

Mr. Dobbertin has a number of health issues that place him at the highest risk for serious illness if infected with COVID-19. The combination of these health risks is particularly dangerous. We discuss each in turn below.

---

[2] Docket Entry (D.E.) 1.

[3] D.E. 25.

[4] D.E. 30.

[5] *See* Exhibit 1 (Progress Report).

[6] https://www.bop.gov/inmateloc/.

*Obesity*

Recent data has found obesity to be "one of the most important predictors of severe coronavirus illness."[7] Mr. Dobbertin turns 48 years old in September and, measured by his weight and body max index (BMI), he is obese.[8] A BMI above 30 is considered obese.[9] Mr. Dobbertin's BMI is 36.5.[10]

Early studies from New York University Langone Health show that people under 60 with COVID-19 and "a BMI of 35 or higher were twice as likely to be admitted to the hospital and three times as likely to end up in the intensive care unit."[11] Other studies are in line with the Langone study including one from Ochsner Health that showed "60% of patients hospitalized with COVID-19 had obesity and that obesity appeared to nearly double their risk of requiring a

---

[7] Roni Caryn Robin, *Obesity Linked to Severe Coronavirus Disease, Especially for Younger Patients,* New York Times (April 16, 2020), at https://www.nytimes.com/2020/04/16/health/coronavirus-obesity-higher-risk.html; *see also* CDC, People of Any Age with Underlying Medical Conditions Are at Increased Risk, (las visited July 6, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#obesity ("Having obesity, defined as a body mass index [] of 30 or above, increases your risk of severe illness from COVID-19).

[8] Exhibit 2 (BOP records demonstrate that Mr. Dobbertin is 6'3" and, as of May 1, 2020, weighs 300 lbs).

[9] Harvard School of Public Health, *Obesity Prevention Score* (accessed 3/26/2020), at: https://www.hsph.harvard.edu/obesity-prevention-source/obesity-definition/

[10] National Heart, Lung, and Blood Institute, *Calculate Your Body Mass Index*, (Accessed May 21, 2020), *available at* https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm.

[11] WebMD Health News, *Obesity new risk factor for young COVID patients*, (April 29, 2020), at https://www.webmd.com/lung/news/20200429/obesity-new-risk-factors-for-young-covid-patients; *citing* Dr. Jenifer Lighter, et al, *Obesity in patients younger than 60 years is a risk factor for COVID-19 hospital admission*, Clinical Infectious Diseases (April 9, 2020), *available at* https://doi.org/10.1093/cid/ciaa415.

ventilator.[12]

The CDC has stated one reason why this risk is so high for people of any age with obesity is a serious breathing problem called acute respiratory distress syndrome (ARDS), which is a major complication of COVID-19 and can cause difficulties with a doctor's ability to provide respiratory support for seriously ill patients.[13] Death by ARDS is particularly agonizing because the patients essentially suffocated to death as a thick film covers the walls of the lungs, preventing oxygen from reaching the bloodstream and any of the vital organs.[14]

### Diabetes

Mr. Dobbertin has Type II diabetes.[15] Diabetes is one of the "most commonly reported conditions" that place an individual at "higher risk for severe disease from COVID-19."[16] A study of patients in United States hospitals with diabetes and/or uncontrolled hyperglycemia found a "markedly higher mortality than patients

---

[12] Roni Caryn Robin, *Obesity Linked to Severe Coronavirus Disease, Especially for Younger Patients*, New York Times (April 16, 2020), at https://www.nytimes.com/2020/04/16/health/coronavirus-obesity-higher-risk.html.

[13] CDC, *Groups at Higher Risk for Severe Illness*, (visited on May 14, 2020), at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html

[14] The New York Times, *How Coronavirus Attacks the Body*, (April 6, 2020) accompanying video available at https://www.youtube.com/watch?v=BuzP-uLctYE

[15] *See* D.E. 28 (PSR) at ¶53.

[16] CDC COVID-19 Response Team, *Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease in 2019 – United States, February 12-March 28, 2020*, MMWR Morb Mortal Wkly Rep 2020 (April 3, 2020), at https://www.cdc.gov/mmwr/volumes/69/wr/mm6913e2.htm

without diabetes or uncontrolled hyperglycemia."[17] Data from the New York Department of Health showed that diabetes was present 37% of patients who died from COVID-19 (as of April 11, 2020).[18]

Because of these increased risks, the American Diabetes Association has written an open letter to all detention facilities, urging relevant parties consider "all possible strategies to release people with diabetes and other serious risk factors related to COVID-19, and to reduce the level of crowding in detention facilities."[19] The letter cogently sets forth the risk to people with diabetes and other health conditions, like Mr. Dobbertin, of the increased "chance of getting seriously ill from COVID-19 . . . because the body's ability to fight off an infection is compromised."[20]

### Hypertension

Mr. Dobbertin also suffers from hypertension (high blood pressure).[21] Courts have recognized that individuals with high blood pressure are among those who are at heightened risk for more severe complications should they contract COVID-19.[22]

---

[17] Dr. Bruce Bode (Clinical Associate Professor at Emory University School of Health), et al, *Glycemic Characteristics and Clinical Outcomes of COVID-19 Patients Hospitalized in the United States*, JOURNAL OF DIABETES SCIENCE AND TECH. (2020), *available at* https://glytecsystems.com/wp-content/uploads/Sage.Glycemic-Characteristics-and-Clinical-Outcomes-of-Covid-19-Patients.FINAL_.pdf

[18] *Id.*

[19] American Diabetes Association, *Open Letter to Detention Centers*, at https://www.diabetes.org/sites/default/files/2020-03/COVID-19%20Letter%20to%20Detention%20Centers.pdf

[20] *Id.*

[21] *See* D.E. 28 (PSR) at ¶53.

[22] *United States v. Lavy*, 17-cr-20033-JAR, 2020 WL 3218110, at *4 (D. Kan. June 15, 2020); *United States v. Scparta*, No. 18-CR-578 (AJN), 2020 WL 1910481, at *9 (S.D.N.Y. Apr. 20, 2020) (citing

A study in China showed that people with one underlying risk factor (categorized as cardiovascular disease, hypertension, and diabetes) were 79% more likely to require intensive care or a respirator that someone with no underlying health conditions.[23] The majority of patients who die of COVID-19 have at least one comorbidity, with hypertension being a frequent culprit. Wuhan data confirmed a high hypertension rate among COVID-19 deaths – nearly half of the patients who died during a 10-day stretch in January had hypertension.[24]  In one report, the most common comorbidity for COVID-19 was hypertension.[25]

Research has also shown increased COVID-19-case fatality rates for individuals with hypertension (and diabetes).[26] And, of most concern, recent studies have shown

---

Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease, Centers for Disease Control and Prevention, *available at* https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinicalguidance-management-patients.html (last updated April 13, 2020); *see also Basank v. Decker*, No. 20-cv-2518 (AT), 2020 WL 1481503, at *3 (S.D.N.Y. Mar. 26, 2020) (noting that hypertension increases risk of harm from COVID-19, taking "judicial notice that, for people of advanced age, with underlying health problems, or both, COVID-19 causes severe medical conditions and has increased lethality," and citing information from the CDC); *United States v. Muniz*, 09 Cr. 199, 2020 WL 1540325, at *2 (S.D. Tex. March 30, 2020).

[23] Dr. Tobias Barker (Chief Medical Officer, Paladina Health), *New Data Shows That Heart Disease and Hypertension Dramatically Increase Risk of Dying from COVID-19 (Coronavirus)*, Paladina Health Blog (March 10, 2020), at https://www.paladinahealth.com/blog/new-data-shows-heart-disease-diabetes-and-hypertension-dramatically-increase-risk-dying-covid; *also see* M. Yuan, et al, *Association of radiologic findings with mortality of patients infected with 2019 novel coronavirus in Wuhan, China*, Plos One (March 19, 2020), at https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0230548

[24] New Wuhan Data Confirm High Hypertension Rate in COVID-19 Deaths, tctMD/the heart beat (April 10, 2020), at https://www.tctmd.com/news/new-wuhandata-confirm-high-hypertension-rate-covid-19-deaths

[25] Clinical features of patients infected with 2019 novel coronavirus in Wuhan, China, Lancet 2020; 395:497–506, *available at* https://www.sciencedirect.com/science/article/pii/S0140673620301835.

[26] American College of Cardiology, *COVID-19 Clinical Guidance For the Cardiovascular Care Team*, ACC Clinical Bulletin (March 6, 2020), at https://www.acc.org/~/media/Non-Clinical/Files-PDFs-Excel-MS-Word-etc/2020/02/S20028-ACC-Clinical-Bulletin-Coronavirus.pdf

that "hypertension was associated with a nearly 2.5-fold increased risk of severe

COVID-19, as well as with a similarly significant higher mortality risk."[27] As Chief

Justice Robinson recently acknowledged, "there is no doubt that hypertension is a

prevalent comorbidity in the COVID-19 patients who suffer severe or fatal illnesses

as a result of the virus."[28]

### 1.3   The poor conditions at FCI Milan.

Mr. Dobbertin is serving his sentence at FCI Milan, a "low security federal

correctional institution with a detention center" in Milan, Michigan.[29] According to

the BOP website, the institution houses 1,308 inmates.[30]

People detained in crowded, locked facilities are at a significantly elevated risk

of contracting infectious diseases due to densely populated living conditions; a

shortage of masks, soap, and hand sanitizer; and the inability to routinely disinfect

---

[27] Lippi G, Wong J, Henry BM, *Hypertension in patients with coronavirus disease 2019 (COVID-19): a pooled analysis*, *Pol Arch Intern Med*. 2020;130(4):304-309. doi:10.20452/pamw.15272

[28] *United States v. Lavy*, 17-cr-20033-JAR, 2020 WL 3218110, at *4 (D. Kan. June 15, 2020) (citing JAMA Internal Medicine, *Risk Factors Associated with Acute Respiratory Distress Syndrome and Death in Patients with Coronavirus Disease 2019 Pneumonia in Wuhan, China* (Mar. 13, 2020), https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2763184 (in a study of 201 infected patients, 84 developed acute respiratory distress syndrome (ARDS), and of those 84 with ARDS, 23 had hypertension compared to just 16 of 117 with hypertension who did not develop ARDS); Lei Fang, George Karakiulakis, & Michael Roth, *Are Patients with Hypertension and Diabetes Mullitus at Increased Risk for COVID-19 Infection?* 8 THE LANCET 4 (Mar. 11, 2020), https://doi.org/10.1016/S2213-2600(20)30116-8 (concluding that the most frequent comorbidities of patients with COVID-19 were diabetes, hypertension, and cerebrovascular disease)).

[29] https://www.bop.gov/locations/institutions/mil/ (July 6, 2020).

[30] *Id.*

surfaces and maintain safe distances between inmates, guards, and staff, who have little to no control over whom they come into contact with.[31]

This has proven true at FCI Milan, which has been at the center of the COVID-19 crisis within the BOP since the beginning, when troubling, internal BOP procedures caused correction officers who were either showing tell-tale, COVID-19 symptoms, or had a confirmed COVID-19 positive test, to continue reporting to work, despite the risk it posed to colleagues and inmates.[32]

As a result, COVID-19-positive cases continue to increase, and inmates have died as a result. According to the BOP's website as of the date of this filing, 93 inmates and 57 staff have tested positive for COVID-19, and there remain 14 active, reported cases.[33] Three prisoners have died—prisoners who cannot be labeled simply as a name. They are us. And they are three of the now 95 reported deaths in BOP.[34]

---

[31] *See e.g.*, Joseph A. Bick, Infection Control in Jails and Prisons, 45 Clinical Infectious Diseases 1047 (2007), https://doi.org/10.1086/521910; Timothy Wilson et al., 'Jails are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars, N.Y. Times (Mar. 30, 2020), https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html; Nicole Wetsman, Prisons and Jails are Vulnerable to COVID-19 Outbreaks, The Verge (Mar. 7, 2020),https://www.theverge.com/2020/3/7/21167807/coronavirus-prison-jail-health-outbreakcovid-19-flu-soap.

[32] AFGE, *A BOP Officer Contracted Coronavirus. He Was Told to Report to Work ASAP*, (May 4, 2020), *available at* https://www.afge.org/article/a-bop-officer-contracted-coronavirus.-he-was-told-to-return-to-work-asap/ (after an FCI Milan correction officer reported he tested positive, his office "told him to return to work if he was fever-free for 72 hours . . . . There was no 14-day quarantine as recommended by the [CDC].").

[33] BOP, COVID-19, *available at* https://www.bop.gov/coronavirus/index.jsp (last visited July 6, 2019).

[34] https://www.bop.gov/coronavirus/index.jsp (last visited July 6, 2020).

To provide demonstrative evidence of the grim reality of the conditions they are forced to cohabitate within, federal prisoners at FCI Milan were able to post a video to social media:[35] https://www.youtube.com/watch?v=lRAXSVCkDQM. As one district court in the Eastern District of Michigan recently opined, "it is undisputed that the progress of the outbreak [at FCI Milan] is ongoing, and the facility still has active inmate infections."[36]

Mr. Dobbertin's medical conditions put him at risk of severe illness or death from COVID-19, and the conditions at FCI Milan make him a sitting duck to exposure to the virus.

## 2. Legal authority.

### 2.1   The Court's authority to reduce a sentence of imprisonment under 18 U.S.C. § 3582(c)(A) where the defendant has exhausted his administrative remedies.

As amended by the First Step Act, 18 U.S.C. § 3582(c)(1)(A) authorizes courts to modify a term of imprisonment as follows:

> The court may not modify a term of imprisonment once it has been imposed except that—in any case—the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of

---

[35] Keri Blakinger and Keegan Hamilton, *"I Begged Them To Let Me Die": How Federal Prisons Became Coronavirus Death Traps*, The Marshall Project (June 18, 2020), *available at* https://www.themarshallproject.org/2020/06/18/i-begged-them-to-let-me-die-how-federal-prisons-became-coronavirus-death-traps (noting the video filed inside FCI Milan).

[36] *United States v. Nazzal*, 2020 WIL 3077948, *4 (June 10, 2020) (granting defendant's motion for compassionate release, noting that as of June 8, 2010, "78 inmates ha[d] tested positive for COVID-19, three ha[d] died, and eight are 'pending recovery.'").

9

imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--

(i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Accordingly, a Court may modify a defendant's term of imprisonment where the defendant meets the exhaustion requirement and demonstrates that "extraordinary and compelling reasons" warrant a reduction of his sentence.

Mr. Dobbertin has satisfied the exhaustion requirement. Mr. Dobbertin, through counsel, submitted a request for compassionate release and/or home confinement to the Warden of FCI Milan on June 3, 2020.[37] More than 30 days have passed since the warden received the request. Accordingly, Mr. Dobbertin is entitled to bring his motion directly to the Court pursuant to 18 U.S.C. § 3582(c)(1)(A).[38]

## 2.2    The Court has the authority to determine whether "extraordinary and compelling reasons" exist without complete deference to the Bureau of Prisons.

Congress has "never defined" what circumstances constitute "extraordinary and compelling," but directed the Sentencing Commission to promulgate "the criteria to be applied and a list of specific" extraordinary and compelling examples.[39] Section

---

[37] Exhibit 3 (Letter to Warden Hemingway (June 3, 2020)).

[38] *See, e.g., United States v. Plank*, 17-cr-20026-JWL, D.E. 62, at 2 (D. Kan. July 2, 2020) (finding Court had jurisdiction to consider the motion on its merits "because defendant filed his motion more than 30 days after submitting his request to the warden").

[39] *United States v. Brown*, No. 4:05-cr-00227-1. 2020 WL 2091802, at *5 (S.D. Iowa Apr. 29, 2020); 28 U.S.C. § 994(t).

3582(c)(1)(A)(i) provides that a sentence reduction must comply with the 18 U.S.C. § 3553(a) factors and "applicable policy statements issued by the Sentencing Commission."

Prior to the First Step Act, the Sentencing Commission issued a policy statement that established three categories of circumstances in which, in the Commission's view, "extraordinary and compelling reasons exist."[40] Those categories include: the prisoner's terminal medical condition or "serious" physical or medical conditions, poor health and advanced age, or family exigency.[41] The policy statement also created a fourth catch-all category, which allowed the BOP director to find "other reasons," "other than, or in combination with" the other three categories, which he determined to be extraordinary and compelling.[42] The policy statement has not been amended after the First Step Act.[43]

The effect of the First Step Act amendments is to transfer the BOP Director's discretion to determine what qualifies as "extraordinary and compelling reasons" to sentencing courts.[44] "[T]he First Step Act authorized courts to act independently of the BOP Director, upon a defendant's motion, once administrative remedies are

---

[40] USSG § 1B1.13 comment. (n.1).

[41] *Id.* (n.1(A)-(C)).

[42] *Id.* (n.1(D)).

[43] The Commission cannot update the policy statement. "As several district courts have pointed out, the Commission currently has only two voting members, two shy of the four that it needs to amend the Guidelines." *Marks*, 2020 WL 1908911, at *6.

[44] *See, e.g.*, *Brown*, 2020 WL 2091802, at *6; *Marks*, 2020 WL 1908911, at *7 (and collecting cases); *Young*, 2020 WL 1047815, at *6.

exhausted, reflecting the First Step Act's legislative purpose and intent to expand the opportunity for a defendant to seek review (and potentially a reduction) of his or her sentence."[45] After the First Step Act, "federal judges are no longer constrained by the BOP Director's determination of what constitutes extraordinary and compelling reasons for a sentence reduction."[46] "Accordingly, the district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release."[47]

"[A]majority of the district courts that have considered the issue have likewise held, based on the First Step Act, that they have the authority to reduce a prisoner's sentence upon the court's independent finding of extraordinary or compelling reasons."[48] Judges in the District of Kansas have agreed.[49] Though some courts have held that they remain bound to the Sentencing Commission's policy statement

---

[45] *Redd*, 2020 WL 1248493, at *7.

[46] *Redd*, 2020 WL 1248493, at *7.

[47] *Young*, 2020 WL 1047815, at *6.

[48] *Young*, 2020 WL 1047815, at *6; *see also, United States v. Arey*, No. 5:05-cr-00029-MFU, 2020 WL 2464796 (W.D. Va. May 13, 2020); *Redd*, 2020 WL 1248493, at *8 (joining "other courts in concluding that a court may find, independent of any motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in" § USSG 1B1.13); *United States v. Fox*, No. 2:14-CR-03-DBH, 2019 WL 3046086, at *3 (D. Me. July 11, 2019); *United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505 at *4 (M.D.N.C. June 28, 2019); *United States v. Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, at *3 (S.D. Tex. June 17, 2019) (holding that "[b]ecause the Commission's statutory authority is limited to explaining the appropriate use of sentence-modification provisions under the current statute, 28 U.S.C. § 994(a)(2)(C), an amendment to the statute may cause some provisions of a policy statement to no longer fall under that authority").

[49] *United States v. Lavy*, 17-cr-20033-JAR, 2020 WL 3218110, at *3-4 (D. Kan. June 15, 2020); *United States v. Jackson*, 2:08-cr-20150-JWL, D.E. 164, at 5-7 (D. Kan. May 29, 2020); *United States v. O'Bryan*, No. 96-10076-03-JTM, 2020 WL 869475, at *2 (D. Kan. Feb. 21, 2020).

regarding the substantive determination as to what are "extraordinary and compelling reasons" despite the passage of the First Step Act,[50] that position is an outlier.

Our interpretation is dictated by the text and purpose of the First Step Act. "Congress amended § 3582 with the explicit goal of "increasing the use and transparency of compassionate release. . . presumably because before the amendment—when access to the courts for § 3582(c)(1)(A)(i) review depended on a BOP motion—the compassionate release statute was under-utilized."[51] In fact, the title of the compassionate release section of the First Step Act is "Increasing the Use and Transparency of Compassionate Release."[52] This language could not be more clear: Congress wanted the federal courts to grant compassionate release more often. And "if the FSA is to increase the use of compassionate release, the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it."[53]

---

[50] *See United States v. Goldberg*, No. CR 12-180 (BAH), 2020 WL 1853298, at *4 (D.D.C. Apr. 13, 2020); *United States v. Brummett*, No. 6: 07-103-DCR, 2020 WL 1492763, at *3 (E.D. Ky. Mar. 27, 2020); *United States v. Lynn*, No. CR 89-0072-WS, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019).

[51] *United States v. Bryant*, No. CR 95-202-CCB-3, 2020 WL 2085471, at *2 (D. Md. Apr. 30, 2020); *see also Redd*, 2020 WL 1248493, at *7 ("The First Step was passed against the backdrop of a documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants.").

[52] First Step Act, Pub. L. 115-391, at § 603.

[53] *Brown*, 2020 WL 2091802, at *7.

This Court should follow the majority view that it is the Court, not the Bureau of Prisons, who decides what constitutes "extraordinary and compelling reasons" that may warrant relief, and whether they are present in this case.

### 2.3 The Court has authority to grant compassionate release to an individual sentenced to a statutory mandatory-minimum term of incarceration.

Courts across the country have held that sentencing courts have authority to consider whether an "extraordinary and compelling reason" warrants a sentence reduction under Section 3582(c)(1)(A) for an individual who received a statutory mandatory-minimum sentence.[54] The Court has discretion to grant Mr. Dobbertin a reduction in his mandatory-minimum prison sentence of 120 months if the Court finds Mr. Dobbertin has met his burden.

### 3. "Extraordinary and compelling reasons" warrant a reduction of Mr. Dobbertin's prison sentence.

As stated above, the Court can exercise its own discretion as to what constitutes "extraordinary and compelling reasons" to warrant a sentence reduction. The only statutory limitation is that the sentence reduction must be "consistent with application policy statements issued by the Sentencing Commission."[55]

Together, Mr. Dobbertin's medical conditions and the outbreak of COVID-19 at FCI Milan in addition to its current conditions that belies any realistic hope for

---

[54] *See, e.g., United States v. Somerville*, 2020 WL 2781585, at *12 (W.D. Penn. May 29, 2020) (finding that "[i]n the context of a compassionate-release motion . . . the Court is permitted to consider whether the section 3553(a) factors warrant a lower sentence, even if the original sentencing judge could not.") (citing decisions holding the same)).

[55] 18 U.S.C. § 3582(c)(1)(A).

effective social distancing demonstrate an extraordinary and compelling reason to reduce Mr. Dobbertin's sentence.

The relief requested here is consistent with USSG § 1B1.13. Application Note 1(A)(ii) to § 1B1.13 provides that an extraordinary and compelling reason includes a "serious physical or medical condition. . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." Additionally, Application Note 1(D) of § 1B1.13 provides a catchall provision entitled "other reasons." It states, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." This portion of the policy statement provides the Court with the flexibility to determine whether a defendant is worthy of relief even if he does not fit neatly into the medical condition, age or family circumstances criteria set forth in previous subsections.

As set forth above, Mr. Dobbertin has multiple "serious" chronic conditions that make him high risk for serious illness or death should he contract COVID-19. As one court explained, "nothing could be more extraordinary and compelling than this pandemic. Early research shows that diabetes patients . . . have mortality rates that are more than twice as high as overall mortality rates."[56] The deadly combination of

---

[56] *United States v. Rodriguez*, __ F.Supp.3d __, 2020 WL 1627331, at *1 (E.D. Penn. 2020).

underlying health issues and a living environment rank with COVID-19 infection make him a sitting duck for serious illness or risk of death. Further, because of the conditions in prison, Mr. Dobbertin "cannot adequately protect himself against infection" from COVID-19.[57]

Mr. Dobbertin's circumstances is further complicated by the COVID-19 global pandemic. According to BOP's website, over 7,000 federal inmates have tested positive for COVID-19 and at least 94 have died.[58] These numbers likely underreport the total infections as the BOP admits testing is limited. Courts all across the country have factored COVID-19 into their rationales for granting compassionate release.[59] This Court should do the same. There is no question Mr. Dobbertin falls within this pool of high-risk inmates susceptible to the virus.

---

[57] *Id.* at *8.

[58] BOP Website, *COVID-19 Coronavirus; COVID-19 Cases*, (last viewed July 6, 2020), at https://www.bop.gov/coronavirus/

[59] *United States v. Hernandez*, No. 18-cr-20474, D.E. 41 (S.D. Fla. Apr. 2, 2020) (granting unopposed motion for compassionate release for defendant with cancer & immunosuppression and just under 12 months left to serve on 39 month sentence); *United States v. Perez*, No. 1:17-cr-513-AT, D.E. 98 (S.D.N.Y. Apr. 1, 2020) (granting compassionate release where "[t]he benefits of keeping [Perez] in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave"); *United States v. Marin*, No. 15-cr-252, D.E. 1326 (E.D.N.Y. Mar. 30, 2020) ("[F]or the reasons stated in his motion, including his advanced age, significantly deteriorating health, elevated risk of dire health consequences due to the current COVID-19 outbreak, status as a non-violent offender, and service of 80% of his original sentence."); *United States v. Muniz*, Case No. 4:09-cr-199, D.E. 578 (S.D. Tex. Mar. 30, 2020) (releasing defendant serving 188-month sentence for drug conspiracy in light of vulnerability to COVID-19: "[W]hile the Court is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers within the United States and beyond our borders in China and Iran demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection."); *United States v. Bolston*, Case No. 1:18-cr-382-MLB, D.E. 20 (N.D. Ga. Mar. 30, 2020) (releasing defendant in part because "the danger inherent in his continued incarceration at the R.A. Deyton Detention Facility . . . during the COVID-19 outbreak justif[y] his immediate release from custody"); *United States v. Powell*, No. 1:94-cr-316-ESH, D.E. 98 (D.D.C. Mar. 28, 2020) (granting unopposed motion for compassionate release in light of COVID-19 and finding it "would be futile" to require defendant to first exhaust in light of open misdemeanor case); *United States v. Campagna*, 2020 WL 1489829

16

Moreover, a sentence reduction in this case would comply with the sentencing factors enumerated in Section 3553(a). Prior to this conviction, Mr. Dobbertin had no criminal history,[60] which is an appropriate consideration under § 3553(a).[61] He has served over 89 months—86% of his sentence, including good time credit—and he is set to release to a halfway house in February 2021, and from BOP custody on August 7, 2021.[62] Mr. Dobbertin "has maintained clear conduct since being incarcerated."[63] And while in BOP custody these last eight years, Mr. Dobbertin has taken advantage of numerous opportunities for personal improvement. Mr. Dobbertin's Progress Report lists the 40-plus BOP programs that he has completed over the last eight years, the most recent of which was the Life Connections Program aimed at fostering personal growth and responsibility,[64] which he graduated from on June 2, 2020.

---

(S.D.N.Y. Mar. 27, 2020) (compassionate release grant); *United States v. Copeland*, No. 2:05-cr-135-DCN (D.S.C. Mar. 24, 2020) (granting First Step Act relief to defendant in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments that defendant has during this current pandemic"); *United States v. Underwood*, Case No. 8:18-cr-201-TDC, D.E. 179 (Mar. 31, 2020) (encouraging release to furlough of elderly defendant in BOP custody because, even though no positive of COVID-19 in his facility, "there is significant potential for it to enter the prison in the near future").

[60] D.E. 28 (PSR) at ¶40-46.

[61] *United States v. Huckins*, 529 F.3d 1312, 1316 (10th Cir. 2008) (recognizing a defendant's lack of criminal history, while already reflected in the criminal history category, is an appropriate consideration under § 3553(a)).

[62] https://www.bop.gov/inmateloc/.

[63] Exhibit 1 (Progress Report).

[64] *See* https://www.bop.gov/policy/om/002_2012.pdf.

17

Mr. Dobbertin also has a sound release plan that the United States Probation Office has already signed off on, which will enable Mr. Dobbertin to quarantine upon release from FCI Milan,[65] and to avoid a transfer to another communal living environment at a halfway house come February 2021. If the Court grants his requested relief, Mr. Dobbertin will live with a married couple who have been long-time family friends of Mr. Dobbertin, who attended high school with the couple's daughters. The couple own their home on 15 acres, are willing to provide Mr. Dobbertin with transportation, and one is a retired nurse and willing and wanting to make sure Mr. Dobbertin receives any medical care necessary. The couple is aware of Mr. Dobbertin's conviction and the conditions he would be required to follow upon release. The couple does not own a computer or laptop, and they are willing to submit to USPO visiting their home as needed.

### 4. Mr. Dobbertin's requested relief.

Mr. Dobbertin is requesting a time-served sentence. It is the only avenue available to the Court to remove Mr. Dobbertin from the real risk of serious illness or death he faces at FCI Milan. The BOP has tools to temporarily release Mr. Dobbertin or to grant him home confinement, but has done neither. In other facilities with similar problems, the BOP has failed to make adequate use of the authority to remove medically vulnerable people from the dangerous conditions at

---

[65] *See* Exhibit 3 at 3-4 (setting forth Mr. Dobbertin's release plan, including pictures of the residence and mobile home in which Mr. Dobbertin may quarantine, and noting USPO Brad Schalow has visited the residence and relayed to counsel that it "checked out").

the prison.[66] That failure is evidenced by the fact that BOP had only reviewed approximately 15% of the people serving sentences at FCI Danbury for home confinement and only released 21 of the nearly 1,000 people serving sentences in the prison.[67] The same is true at FCI Elkton in Ohio, where one federal judge referred to the BOP's efforts to release people on home confinement as "minimal" and accused the BOP of "thumbing their nose at the authority to authorize home confinement."[68]

Mr. Dobbertin requests that the Court reduce his sentence to time served. His current projected release date is August 7, 2021—just over one year from now. The Court originally imposed a five-year term of supervised release. Should the Court wish, the Court could add a supervised-release condition of home confinement for one year, which would place Mr. Dobbertin under home confinement for the remaining portion of his prison sentence.

## 5. Conclusion

The Court has the jurisdiction and the discretion to decide whether to grant this motion to reduce Mr. Dobbertin's prison sentence. For the reasons stated herein,

---

[66] Walter Pavlo, *Federal Judge Demands Action at Danbury Federal Prison as COVID-19 Spreads*, Forbes (May 14, 2020), at https://www.forbes.com/sites/walterpavlo/2020/05/14/federal-judge-demands-action-at-danbury-federal-prison-as-covid-19-spreads/#345b17149599

[67] *Id.*

[68] *Wilson v. Williams*, 4:20-cv-00794 D.E. 85 (N.D. Ohio); at https://www.documentcloud.org/documents/6896091-BOP-vs-ACLU-Elkton-Order-to-Enforce.html

Mr. Dobbertin has presented extraordinary and compelling reasons for a reduction

of his prison sentence to time served.


Respectfully submitted,


s/ Kathryn Stevenson
Kathryn Stevenson KS #27120
Assistant Federal Public Defender
117 SW Sixth Avenue, Suite 200
Topeka, Kansas 66603
Phone: 785-232-9828
Fax: 785-232-9886
Email: Katie_Stevenson@fd.org
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2020, I electronically filed the foregoing with the
clerk of the court by using the CM/ECF system, which will send a notice of
electronic filing to the following:

Jared Maag
Assistant United States Attorney
Jared.Maag@usdoj.gov


s/ Kathryn Stevenson
Kathryn Stevenson, KS #27120

20